UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
STEVEN NIEVES,

            Plaintiff,

     – against –

ANDREW SAUL, Commissioner of Social Security,[1]

            Defendant.
-----------------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-00416 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Steven Nieves brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 12, 17.) Plaintiff seeks reversal of the Commissioner's decision and an immediate award of benefits, or alternatively, remand for further administrative proceedings. (Plaintiff's Brief ("Pl.'s Br."), Dkt. 12-1, at 20.) The Commissioner seeks affirmation of the denial of Plaintiff's claims. (Defendant's Brief ("Def.'s Br."), Dkt. 18, at 31.) For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further proceedings consistent with this Order.

---

[1] Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted as Defendant in this action.

## BACKGROUND

**I.    Procedural History**

On February 11, 2014, Plaintiff filed an application for DIB, claiming that he has been disabled since August 3, 2012. (Administrative Transcript ("Tr."[2]), Dkt. 19, at 165–66.) The claim was initially denied on June 19, 2014, and Plaintiff requested and appeared for a hearing before an administrative law judge ("ALJ") on May 10, 2016. (*Id.* at 20.) By decision dated October 5, 2016, ALJ Patrick Kilgannon found that Plaintiff was not disabled within the meaning of the Social Security Act from August 3, 2012, his alleged onset date, through the date of the ALJ decision.[3] (*Id.* at 34.) On November 30, 2016, Plaintiff requested a review of the ALJ decision, which was denied by the SSA Appeals Council on November 27, 2017. (*Id.* at 5.) This appeal timely followed.[4]

---

[2] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

[3] The ALJ also considered the claimant's earnings records and determined that Plaintiff "has acquired sufficient quarters of coverage to remain insured through December 31, 2017. Thus, the [plaintiff] must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits." (Tr. at 20.) That portion of the decision was not appealed by Plaintiff. (*See generally* Pl.'s Br., Dkt. 12-1.)

[4] Under Title 42, United States Code, Section 405(g):

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

"Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that the

## II. The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe" impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five. 20 C.F.R. § 404.1520(e). The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise, the ALJ will proceed to step five to determine whether the claimant, given the claimant's RFC, age,

---

request was timely, as Plaintiff received the Commissioner's final decision on December 2, 2017 and filed the instant action on January 22, 2018—51 days later. (*See* Pl.'s Br., Dkt. 12-1, at 8.)

education, and work experience, has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits. *Id.*

The ALJ's October 5, 2016 decision followed the five-step evaluation process established by the SSA to determine whether an individual is disabled. (Tr. at 21–22.) At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 3, 2012. (*Id*. at 22.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "cervical degenerative disc disease status-post August 3, 2012 anterior cervical discectomy and fusion (ACDF) procedure; cervical radiculopathy; chronic low back pain with right-sided lumbar radiculopathy; left shoulder impingement and bursitis; and, obesity." (*Id.* at 22 (citing 20 C.F.R. § 404.1520(c))). However, the ALJ found that, although Plaintiff satisfied his burden in the first two steps, he failed on the third step, and that none of Plaintiff's impairments met or medically equaled the severity of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id*. at 23.)

Having determined that Plaintiff's impairment did not meet or medically equal any of the impairments in the Listings, the ALJ determined Plaintiff's RFC, finding that Plaintiff was able to perform a "range of light work[5] as defined in 20 [C.F.R.] 404.1567(b)." (*Id*. at 24.) Specifically,

---

[5] According to the applicable regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If [a claimant] can do light work, [the Agency] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

the ALJ found that Plaintiff can sit for six hours, stand and/or walk for six hours, and lift and/or carry up to twenty pounds occasionally and up to ten pounds frequently. (*Id*. at 24.)

At step four, the ALJ determined that Plaintiff can perform past relevant work as a detective because "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (*Id*. at 32.) However, the ALJ determined at step five that, even if Plaintiff is unable to perform past relevant work, based on the vocational expert's testimony and Plaintiff's age, education, work experience, and RFC, "there are other jobs existing in the national economy that he is also able to perform." (*Id*. at 33.) The ALJ subsequently concluded that Plaintiff was not disabled from the alleged onset date of August 3, 2012 through the date of the ALJ decision, October 5, 2016, as defined in the Social Security Act. (*Id*. at 34.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation marks omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and alterations omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). However, the Court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v.*

5

*Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## DISCUSSION

Plaintiff contends that the ALJ failed to properly weigh the medical evidence and his decision is therefore not based upon substantial evidence. (Pl.'s Br., Dkt. 12-1 at 14.) More specifically, Plaintiff argues that the ALJ erred by affording significant weight to the testimony of the non-examining consulting physician while assigning limited weight to the treating physician's opinion. (*Id.* at 9–10; Tr. at 29.) The Court agrees and remands this case for further proceedings.

The SSA has mandated specific procedures an ALJ must follow when considering the weight to assign to a treating physician's opinion. *See* 20 C.F.R. § 404.1527. "[T]he opinion of a [plaintiff]'s treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).[6] There are several factors that an ALJ must explicitly consider when weighing medical evidence. As the Second Circuit has explained:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other

---

[6] The SSA has amended the treating physician's rule to only apply to claims filed before March 27, 2017. 20 C.F.R. § 404.1527. Plaintiff's claim was filed in February 2014, and so the treating physician rule still applies. (Tr. at 165–66.)

6

factors brought to the [SSA's] attention that tend to support or contradict the opinion. The regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight [he] gives claimant's treating source's opinion.

*Halloran v. Barnhardt*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (internal quotation marks and citations omitted); *see also Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019); *Burgess*, 537 F.3d at 129.

In addition to the medical evidence submitted into the record, described below, Plaintiff, a former police detective and investigator, testified at the hearing and described his daily activities and limitations. (Tr. at 57–62.) He stated that he suffered from a job-related injury and had ACDF surgery in 2012. He testified that, post-surgery, he still suffers from neck pain radiating down his left shoulder, a burning sensation in his right hand, back pain through his hips, and "sciatic pain" in his left leg. (*Id.* at 60–61.)

Plaintiff was initially injured while performing his work duties as a police officer in February 2011. (*Id.* at 258, 292, 309, 512.) He began treatment with Rohit Verma, M.D., an orthopedic spine surgeon, on May 4, 2011. (*Id.* at 292–96.) Dr. Verma diagnosed Plaintiff's complaints of neck pain, shoulder pain, and occasional numbness radiating down his right leg as herniated cervical discs at C4-C5 and C5-C6. (*Id.* at 309.) On May 24, 2011, Plaintiff returned to Dr. Verma with complaints that his symptoms had increased after a work-related car accident. (*Id.* at 286–90, 309.) His diagnosis remained unchanged. (*Id.* at 282–83.) Plaintiff returned to Dr. Verma on November 8, 2011, at which time Dr. Verma concluded that Plaintiff would benefit from the ACDF procedure. (*Id.* at 280–81.) Dr. Verma performed neck surgery, including ACDF of C4-C5 and C5-C6, and insertion of hardware[7] on August 3, 2012. (*Id.* at 305–09, 311.) Dr.

---

[7] In Plaintiff's case, the anterior cervical discectomy and fusion was a procedure that "dissected out" the C-4, C-5, and C-6 vertebrae using a surgical approach from the front of the

7

Verma continued to treat Plaintiff until May 2013, when Dr. Verma discharged him from care. (*Id*. at 60.) Plaintiff's submitted medical records include his records from Dr. Verma's treatment.

Plaintiff was then treated by pain management specialist and neurologist Kerin Hausknecht, M.D., from 2012 through the time of the ALJ's decision. (*Id*. at 240–57, 534–46.) In Dr. Hausknecht's 2015 Physical Capacity Evaluation of Plaintiff, he opined that Plaintiff could cumulatively sit for four hours in a workday, stand or walk for an hour or less in a workday, and could occasionally lift ten pounds. (*Id.* at 240–41.) Dr. Hausknecht completed an updated Physical Capacity Evaluation of Plaintiff in 2016, indicating slightly more limitation, such as sitting for no more than two hours a day. (*Id.* at 545–46.) Dr. Hausknecht continuously indicated that, post-surgery, Plaintiff suffered from chronic neck and back pain. (*Id.* at 240–57, 534–46.) Dr. Hausknecht prescribed Lidoderm for pain, Flexeril for spasms, Oxycodone for pain, and Gabapentin to help with neuropathic pain, and, on September 22, 2015, he administered steroid shots in response to muscle weakness in Plaintiff's right extensor hallucis longus muscle. (*Id*. at 243, 247, 249, 252, 255, 257, 535, 538, 541, 544.)

The ALJ's decision to assign limited weight to Dr. Hausknecht's opinion violates the treating physician rule and is not supported by substantial evidence. The ALJ wrote that Dr. Hausknecht's opinion was "vague, conclusory, not a specific function-by-function assessment[,] . . . inconsistent with the overall evidence of record[, s]pecifically . . . the relatively unremarkable clinical examination findings by operative surgeon Dr. Verma . . . [and] relatively minimal objective findings[.]" (*Id.* at 30.)

---

neck. (Tr. at 306.) This procedure sought to decompress the nerves and spinal cords. (*Id.* at 307.) The "fusion" aspect of the procedure was accomplished by inserting a 7-mm implant and bone graft material into the disk space. (*Id.*)

8

At the outset, the Court notes that it is wholly reasonable for Dr. Hausknecht's opinion to be inconsistent in some respects with Dr. Verma's findings; Dr. Verma, a surgeon with a different specialty than Dr. Hausknecht, who specializes in psychiatry, neurology, and pain management (*see id.* at 534), last treated Plaintiff in April 2013, and Dr. Hausknecht's formal evaluations indicating Plaintiff's functional limitations were done in June 2015 (*id.* at 240) and May 2016 (*id.* at 545)—two and three years, respectively, after Dr. Verma discharged Plaintiff from his service. In 2016, Dr. Hausknecht observed Plaintiff's gait, examined his cervical spine, noted observable motor restrictions, and documented spasm and restriction of mobility in his lumbar spine. (*Id.* at 535.) The doctor also noted depressed bicep and ankle reflexes. (*Id.*) Based on his assessment, Dr. Hausknecht diagnosed (1) "[t]raumatic cervical spine derangement with herniated disc and radiculopathy; status post cervical spine fusion surgery"; and (2) "[t]raumatic lumbar spine derangement with herniated disc and radiculopathy." (*Id.*) He described the medical plan as follows:

> I have recommended [Plaintiff] continue with symptomatic therapy and home exercise. I have renewed prescriptions for his chronic pain medications as well as medicine to help with spasm, tingling and inflammation. At this point I believe he will experience permanent neurological impairment. I do not believe he can be gainfully employed in any capacity due to the chronic neck and back pain. He is presently suffering from an 80% neurological impairment. His prognosis for improvement is poor.

(*Id.*) "When there is such a lengthy time period between opinions, the ALJ must explain his decision to choose the earlier opinion over the more recent opinion where deterioration of a claimant's condition is possible." *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 266 (E.D.N.Y. 2010) (citing *Ligon v. Astrue*, No. 08–CV–1551 (JG) (MDG), 2008 WL 5378374, at *10 (E.D.N.Y. Dec. 23, 2008); *Huhta v. Barnhart*, 328 F. Supp. 2d 377, 386 (W.D.N.Y. 2004); *Ellington v. Astrue*, 641 F. Supp. 2d 322, 332 (S.D.N.Y. 2009)). The ALJ failed to provide that explanation.

9

Furthermore, to the extent that the ALJ perceived Dr. Hausknecht's opinion as inconsistent or in conflict with a different medical provider, he had the responsibility to solicit additional testimony and further develop the record. Here, the ALJ primarily based the perceived inconsistencies on what he termed "conservative" care and a perceived lack of clinical examinations or objective evidence, without any consideration or medical explanation as to what the appropriate treatment might be. (*See* Tr. at 24.) Courts in this Circuit have held that "the ALJ must make every reasonable effort to help an applicant get medical reports from his medical sources" and "must seek additional evidence or clarification when the report from the claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (citing 20 C.F.R. 404.1512(e)(1); 416.912(e)(1)) (internal quotation marks, citations, and alterations omitted); *see also* 20 C.F.R. § 416.927(d)(2). "This rule applies even where the plaintiff was represented by counsel at the hearing." *Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900 (JCF), 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)). Furthermore, while a "treating physician's statement that the [plaintiff] is disabled cannot itself be determinative[,] . . . failure to develop conflicting medical evidence from a treating physician is legal error requiring remand." *Rocchio v. Astrue*, No. 08-CV-3796 (JSR) (FM), 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010), *report and recommendation adopted*, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011) (internal quotation marks omitted) (alterations in the original); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Thus, if the ALJ perceived some inconsistencies between the opinion and records of Dr. Hausknecht, he should have taken

affirmative steps to develop a sufficient record, including consulting with Dr. Hausknecht, if necessary.

Additionally, while an ALJ is entitled to disregard the opinion of a claimant's treating physician *after* giving the physician the opportunity to correct the deficiencies in his medical reports, the ALJ must make clear that this decision is based on conclusions made by a medical professional. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." (citing *Burgess*, 537 F.3d at 131). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hillsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (citation omitted). In this case, the ALJ accorded less weight to Dr. Hausknecht's opinion based on the ALJ's own assessments that (1) "the objective evidence does not generally support" the "greater functional restrictions" indicated by Plaintiff's "treating or examining physicians" (Tr. at 32); and (2) "[a]lthough the [Plaintiff] has received treatment for his impairments, the treatment has essentially been routine and/or conservative in nature[]" (*id.*). This decision amounted to the ALJ improperly substituting his own opinion for that of Plaintiff's physician. *See Beckers v. Colvin*, 38 F. Supp. 3d 362, 374–75 (W.D.N.Y. 2014) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination. Nor is it appropriate for an ALJ to substitute his own opinion for the findings of medical sources on the record." (internal quotation marks and citation omitted)); *Indelicato v. Colvin*, No. 13-CV-4553 (JG), 2014 WL 674395, at *3 (E.D.N.Y. Feb. 21, 2014) (noting that "an ALJ is not a doctor, and therefore is not equipped to make medical judgments").

Moreover, the ALJ's reference to a lack of clinical examinations or objective findings as a reason for according limited weight to Dr. Hausknecht's opinions was improper. "[M]edically acceptable clinical and laboratory diagnostic techniques" include consideration of "[a] patient's report of complaints, or history, [a]s an essential diagnostic tool." *Burgess*, 537 F.3d at 128 (internal quotation marks and citation omitted). Dr. Hausknecht cited patient reports and history in his evaluations, such as "generally not[ing Plaintiff's] 'complaints' of paresthesia in the left forearm and right leg." (*See* Tr. at 242, 246–248, 253, 256.) However, the ALJ discounted this finding of paresthesia because it was "not entirely clear whether this is a clinical examination finding or an objective finding." (*Id.* at 29.) The ALJ thus erroneously discounted Dr. Hausknecht's reliance on Plaintiff's complaints as a diagnostic tool. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that [the treating physician] also relied on [the plaintiff]'s subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." (internal quotation marks and alterations omitted)).

Finally, the ALJ afforded "significant weight" to the opinion of Dr. Fuchs, a consultative expert who never examined Plaintiff (*see* Tr. at 570–72), in part because he is "an impartial medical expert . . . [who] has extensive and specialized knowledge of the requirements of the Social Security Act and its accompanying Regulations" (*id.* at 29). The Court notes that this reasoning is directly contradictory to the jurisprudence of this Circuit and contrary to the rationale for the treating physician rule. *See Estrella*, 925 F.3d at 95–96; *Burgess*, 537 F.3d at 129; *Halloran*, 362 F.3d at 32.[8]

---

[8] The medical evidence also included a June 9, 2014 report from consulting physician Lali Levi, M.D. (Tr. at 258–61), and medical records from Robert Fisch, M.D., a radiologist (*id.* at 225–39). Dr. Levi found that, "[f]rom a musculoskeletal point of view, the [plaintiff] has

For these reasons, the Court finds that the ALJ's weighing of the extensive medical evidence in this case was not supported by substantial evidence in the record and thus requires remand of this matter.[9] On remand, the ALJ is directed to evaluate all of the relevant medical evidence, and as described *supra*, provide explicit reasons for how he or she determines the weight and import of the medical opinions comprising the record.

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: December 30, 2019
 Brooklyn, New York

---

limitations [in his ability] to stand, walk, climb[.]" (*Id.* at 261.) Dr. Levi also found that Plaintiff was "limited [in] activities requiring great exertion because of the pain in his neck, shoulders, and back," and had a "mild restriction for standing and walking and moderate restriction for squatting and kneeling" as well as a "marked restriction for heavy lifting and carrying[.]" (*Id.*) Finally, Dr. Levi determined that Plaintiff had no restriction for fine manipulation. (*Id.*) Plaintiff saw Dr. Robert Fisch, a radiologist, pre-operation on October 27, 2011, January 9, 2012, and March 15, 2012, and returned post-operation on November 18, December 1, and December 10, 2014, complaining of left shoulder pain. (*Id.* at 225–39.) Dr. Fisch found that Plaintiff suffered from highgrade partial tearing of the supraspinatus tendon with no retraction or muscle atrophy. (*Id.* at 225.) Dr. Fisch's assessment was shoulder pain, rotator cuff syndrome, shoulder impingement syndrome, and later epicondylitis. (*Id.* at 227, 229–30, 232–33.) During the November 18 and December 1, 2014 visits, Dr. Fisch administered an injection into Plaintiff's elbow and a "Large Joint Injection" in Plaintiff's shoulder due to pain and inflammation. (*Id.* at 230, 233.)

[9] The Court finds that this reason is alone sufficient to warrant a remand and does not address Plaintiff's remaining arguments.